IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 04-cv-02138-PSF-BNB

MARTHA WHITCOMB,

     Plaintiff,

v.

FIRST AMERICAN NATIONWIDE DOCUMENTS,

     Defendant.

---

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This employment dispute comes before the Court on defendant's motion for summary judgment (Dkt. # 17), filed August 29, 2005, together with defendant's brief and Exhibits A through H ("Defendant's Motion").  Plaintiff filed her opposition to Defendant's Motion on October 5, 2005 (Dkt. # 25), together with Exhibits A through G ("Plaintiff's Response").  Defendant filed its reply on November 4, 2005 (Dkt. # 34), together with another set of Exhibits lettered A and B ("Defendant's Reply").  On October 27, 2005, the parties submitted a Final Pretrial Order (Dkt. # 32).  On November 2, 2005, this matter was set for a five-day jury trial commencing February 27, 2006.  This matter is ripe for determination.  The Court has determined that oral argument will not be of material assistance.

## BACKGROUND

Plaintiff Martha Whitcomb commenced employment with Defendant First American Nationwide Documents ("FAND") in October 2000 in the position of

Business Analysis Manager at a salary of $75,000 per year, with a 20% annual bonus paid quarterly and an annual discretionary bonus (Defendant's Motion at 2; Plaintiff's Response at 2).  She remained employed at FAND until on or about January 30, 2004 (Complaint, ¶ 15).  During nearly the entire tenure of her employment, plaintiff was supervised by Barbara Ricketts, the Executive Vice-President and later President of FAND (Defendant's Motion at 3; Plaintiff's Response at 2; Affidavit of Ricketts, Exhibit B to Defendant's Motion, at ¶ 1).

In February 2001, Ms. Ricketts increased plaintiff's salary to $77,040 and her bonus to $20,575, for total compensation of $97,615 (Defendant's Motion at 3; Plaintiff's Response at 2).  In March 2001, Ms. Ricketts promoted plaintiff to operations director and increased her salary to $80,892 (*id.*).  In August 2001, Ms. Ricketts promoted plaintiff to the position of Vice President of Operations (*id.*).  In February 2002, Ms. Ricketts increased plaintiff's salary to $87,363, and her bonus to $22,235 for total compensation of $109,688.  In February 2003, Ms. Ricketts increased plaintiff's salary to $90,595, and her bonus to $24,500 for total compensation of $115,095.  (*Id.*) Thus, plaintiff received four salary increases and two promotions during the 39 months she worked at FAND.

Once she was promoted to Vice President of Operations, plaintiff became a member of Ms. Ricketts' "Senior Management Team."  Only members of the Senior Management Team hold the title of Vice President (Defendant's Motion at 4; Plaintiff's Response at 2).  At or about the same time plaintiff was promoted to Vice President of Operations (August 2001), Ms. Ricketts promoted Randy Gilster to the position of Vice

President of Information Technology and Peter Gilbert to the position of Vice President of Business Services (*id.*).  In August 2003, Ms. Ricketts hired Alan Clark as General Counsel and Senior Vice President.  Thus plaintiff, and Messrs. Gilster, Gilbert and Clark served as part of the Senior Management Team during periods of their employment.  (*id.*).  Mr. Gilbert left FAND in October 2002 (Defendant's Motion at 5; Plaintiff's Response at 2).

In mid-January 2004, plaintiff attended a Senior Management Team meeting with Ms. Ricketts, Mr. Clark and Mr. Gilster, during which plaintiff proposed to Ms. Ricketts that in order to address ongoing issues and needs within the company, a restructure could occur in which plaintiff would step down from senior management to provide operations support to Mr. Clark (Defendant's Motion at 7; Plaintiff's Response at 3).   Plaintiff alleges, and defendant agrees, that the proposal was "accepted." (Complaint, ¶ 13; Defendant's Motion at 7).

Plaintiff alleges that under her proposal, her title, salary and unspecified "perquisites" of employment would remain the same (Complaint, ¶ 13).  Defendant asserts that plaintiff's salary would (and did) remain the same, but she would not be permitted to retain her title of Vice President (Defendant's Motion at 7).  As noted above, the defendant asserts it was a company policy that only members of the Senior Management Team are given the title of Vice President.

Plaintiff testified that on or about Wednesday, January 21, 2004, she provided Mr. Clark with a proposed description of what would be her new position.  Shortly thereafter, plaintiff received a communication from Mr. Clark, apparently an e-mail,

advising her that as part of the new position she would have to give up her reserved parking space, her company cell phone and company credit card (Whitcomb Depo., Exhibit A to Defendant's Motion and Exhibit E to Plaintiff's Response, at pp. 284-86).[1] The defendant agrees that it would not let plaintiff retain her reserved parking space, company cell phone or company credit card, as it is company policy that project managers do not have such items (Defendant's Motion at 7).

Plaintiff was upset about the information she received from Mr. Clark regarding these items, as well as the "tone" of his e-mail and communications.  On the next day, Thursday, she expressed her displeasure to Ms. Ricketts (Whitcomb Depo., at 288, 291).  Plaintiff testified that Ms. Ricketts advised her to take Friday off and think about the matter over the weekend (*id.* at 291; Defendant's Motion at 8; Plaintiff's Response at 3).  On Monday morning, January 26, 2004, plaintiff telephoned Ms. Ricketts and advised her that she did not think she could continue working at FAND under the circumstances, and she was going to accept an offered severance package.[2]  *(Id.* at 296; Defendant's Motion at 8; Plaintiff's Response at 3).  Plaintiff did not again speak to Ms. Ricketts about this nor did she return to work (*Id.* at 296-97).

---

[1]   The parties have attached separate excerpts from Ms. Whitcomb's deposition as Exhibits to their briefs.  *See*  Exhibit A to Defendant's Motion and Exhibit E to Plaintiff's Response.  Unfortunately, neither version is a complete copy of all the relevant pages.  The Court has reviewed both versions to obtain the plaintiff's testimony as to what she claims occurred.  Hereafter, the Court refers to both exhibits, collectively, as "Whitcomb Depo."

[2]   Plaintiff testified that the severance package, consisting of three months compensa-tion, was offered by defendant's human resources department later the same week, but she declined to accept it on the advice of counsel (Whitcomb Depo., at 299-301).

**PLAINTIFF'S COMPLAINT**

After filing a charge of discrimination with the EEOC and receiving a notice of right to sue, plaintiff timely filed her complaint on October 15, 2004 alleging four claims for relief.  A 45-year old female at the time her employment with defendant ended, plaintiff alleges discrimination on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (First Claim), discrimination on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (Second Claim), a claim under the doctrine of promissory estoppel (Third Claim) and a claim for breach of contract (Fourth Claim).  As there is no diversity of citizenship between plaintiff and defendant, the Third and Fourth Claims for Relief are dependent on this Court's exercise of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

Plaintiff's claims of gender and age discrimination appear to arise primarily from her allegation that during the course of her employment she was treated less favorably in terms of compensation and bonuses than similarly situated younger male employees despite the fact that she had more seniority with the company (Complaint, ¶ 10). Plaintiff also alleges she was "aware of a pattern or practice of discriminatory treatment towards women, especially women over the age of 40 relative to pay, promotions, demotions, work assignments, hostility towards women and termination of women." (*Id.*)  She also appears to allege that, what she describes in her complaint as a termination from the company but in her later-filed brief as a "constructive discharge,"

was disparate treatment of plaintiff by the company motivated by her age (Complaint, ¶¶ 15, 39; Plaintiff's Response at 11-12, 19).

Plaintiff's claims under the doctrine of promissory estoppel are rather vague as pled in the complaint, alleging only that defendant had "certain" unspecified policies and practices which it represented it would follow, but did not, "including in terminating plaintiff's employment" (Complaint, ¶¶ 34-35). Similarly, her claim for breach of contract is amorphous, alleging only that plaintiff and defendant "were engaged in a contractual relationship, including pursuant to terms and conditions contained in various employment related publications" (Complaint, ¶ 38) and that defendant breached its contract with plaintiff, "including in terminating plaintiff's employment" (Complaint, ¶ 39).

**DEFENDANT'S MOTION**

Defendant moves for summary judgment on all of plaintiff's claims on several different grounds. The Court finds that it only needs to address the following arguments made by defendant.

First, defendant argues, plaintiff can not make out a *prima facie* case of age or gender discrimination with respect to her compensation or the conditions of employment while she was employed. Second, defendant asserts that plaintiff cannot show any discrimination in connection with what she describes as her "demotion" from the Senior Management Team. Third, defendant argues that plaintiff cannot show that her separation from employment amounted to a termination, or even a constructive discharge, thus she cannot establish a *prima facie* case of discrimination in connection

with the termination of her employment.  Defendant also asserts that plaintiff's claim for promissory estoppel fails because she cannot show detrimental reliance on any promise made by defendant.  Finally, defendant argues that as an at-will employee, plaintiff cannot show that there was a "contract" of employment, much less a breach of such contract.

Plaintiff argues that there are genuine disputes of material fact as to each of her four claims that precludes the entry of summary judgment as to any of them.

**STANDARD OF REVIEW**

The purpose of a summary judgment motion is to assess whether a trial is necessary.  *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir. 1995).  In other words, there "must be evidence on which the jury could reasonably find for the plaintiff."  *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996).  A court grants summary judgment for the moving party only where there is no genuine issue as to any material fact in the pleadings, depositions, answers to interrogatories, admissions, and affidavits.  F.R.Civ.P. 56(c).  When applying this standard, a court must view the factual record in the light most favorable to the non-movant.  *Applied Genetics Int'l., Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

As Defendant's Motion sets forth various grounds as to the various claims asserted by plaintiff, this Order separately addresses the defendant's arguments.

-7-

ANALYSIS

A.    **Whether plaintiff has established a *prima facie* case of gender or age discrimination in the terms of her compensation or conditions of employment.**

The parties are in agreement that the burden-shifting framework of the

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973) decision applies to

determine whether plaintiff has established a *prima facie* case of either gender or age

discrimination.  Under that structure, plaintiff must show that: (1) she was within the

protected gender or age group; (2) she was adversely affected by an employment

decision; (3) she was qualified for the position or doing satisfactory work; and (4) she

was treated less favorably than similarly situated younger individuals, or males not in

the protected class.  *Bullington v. United Airlines, Inc.*, 186 F.3d 1301, 1315-16 (10th

Cir. 1999).

Defendant asserts that plaintiff cannot establish, as she alleges, that she was

treated less favorably than any similarly situated younger, male employee with respect

to salary or bonuses (Complaint ¶¶ 10, 29).  It appears that plaintiff initially believed

and argued that the "peers" with respect to whom she was treated less favorably in

terms of compensation were Messrs. Gilbert, Gilster and Clark, each of whom is male

and younger than her (*see* Exhibit G to Defendant's Motion, Plaintiff's Responses to

Second Set of Interrogatories, at 3-4).  However, after defendant demonstrated in its

opening brief that Mr. Gilbert was actually paid less than plaintiff at all times while he

was working at FAND (Defendant's Motion at 5), and pointed out that Mr. Clark was

not similarly situated to plaintiff since he was a licensed attorney with ten years of

-8-

experience as an in-house legal counsel (Defendant's Motion at 6), plaintiff apparently retracted and refocused her argument.

In her response brief plaintiff argued only that Mr. Gilster was a similarly situated comparator for purposes of her discrimination claim relating to compensation. *See* Plaintiff's Response at 6, 10. Plaintiff states that Mr. Gilster was paid $32,000 more in base salary than plaintiff, received a larger bonus, and suggests that she performed similar functions and even took over some of his duties (*id.*).

Defendant does not deny that Gilster was paid more than plaintiff, but argues that he is not a valid comparator to plaintiff's position. Gilster had started employment with the company some seven years prior to plaintiff, had worked his way up the "technical ladder" from computer analyst to become defendant's IT director in March 2001, at which time he received a substantial boost in salary. *See* Defendant's Reply at 3; Exhibit A to Plaintiff's Response. In August 2001, Gilster became Vice President of IT, at the same time plaintiff became Vice President of Operations. Both received title changes, but neither received a salary increase at that time, thus they were treated similarly (*id.*).

As Vice President of IT, Gilster was in charge of defendant's technical direction of information technology, and his job responsibilities included performing IT product development, developing software applications, creating stable user environments, working with clients to build custom IT solutions and performing IT troubleshooting. Plaintiff admitted that she was not capable of performing these technical functions (Defendant's Motion at 5-6; Plaintiff's Response at 2-3). Gilster had three years of

college level technical education from Texas Tech University compared to plaintiff's completion of only 13 credit hours at a post-secondary level, and Gilster had taken extensive continuing education courses in database design, program network and system administration, software design and network protocols (Defendant's Motion at 3, 5; Plaintiff's Response at 2).  Finally, plaintiff admitted that Gilster's annual salary as Vice President IT was higher than plaintiff's based on defendant's assessment of salary ranges for technical versus nontechnical Vice Presidents, as well as Gilster's experience, job function and responsibilities (Defendant's Motion at 5; Plaintiff's Response at 2).

Based on this state of the record, the Court finds that plaintiff's comparison between her position and Gilster's is not a comparison of similarly situated employees. As the Tenth Circuit stated in *Block v. Kwal-Howells, Inc.*, 92 Fed. Appx. 657, 660 (10th Cir., Feb. 17, 2004), "[t]he burden is on the plaintiff to show that she is similarly situated to the employee with whom she is comparing herself," citing *Cone v. Longmont United Hospital Ass'n,* 14 F.3d 526, 532 (10th Cir. 1994).  "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).  While it is true that plaintiff and Gilster had the same supervisor (Ms. Ricketts), that is not the end of the inquiry.  As stated in *Aramburu*, the court must also compare the relevant employment circumstances, such as work history and company policies.  *Id.*  And, as held in *Block, supra,* employees who have different backgrounds and bring different levels of experience and knowledge to their respective

positions, may not be similarly situated.  92 Fed. Appx. at 660.  Moreover, the fact that

both plaintiff and Mr. Gilster held the title of Vice President is not determinative, as

such argument goes only so far "when the actual job functions are considered.  Similar

titles alone do not satisfy the requirement of similarity between jobs."  *Id.*

Mr. Gilster's longer experience with the defendant, his higher level of education,

his technical training and knowledge, his assignment to perform technical IT work, as

well as the admission by plaintiff that she was not capable of performing these technical

functions, all lead this Court to conclude that plaintiff's attempt to compare her job to

that of Mr. Gilster fails.  Plaintiff and Mr. Gilster were not similarly situated for purposes

of the application of the *McDonnell Douglas* burden of a *prima facie* case.

Plaintiff offers no direct evidence that she was treated in a discriminatory fashion

in connection with her compensation, such as ageist or gender-based comments from

her supervisor.  Nor, despite her allegations (Complaint at ¶ 10), has plaintiff come

forward with any evidence whatsoever of the defendant engaging in a pattern or practice

of discriminatory treatment towards women that would permit an inference based on

disparate impact.  Thus this Court finds that defendant is entitled to summary judgment

as to plaintiff's claims of discrimination based on gender and age in connection with her

compensation while employed by defendant.

**B.**  **Whether plaintiff has established a *prima facie* case of gender or age discrimination in connection with her "demotion" from the Senior Management Team.**

Plaintiff appears to allege that she was subject to discrimination based on gender

and age in connection with the events of January 2004, which she describes as a

"demotion" from her position as Vice President (Complaint at ¶¶ 13, 15, 27).  Plaintiff argues in her response to the defendant's motion that the loss of title, benefits and perquisites of employment in January 2004, at the time of the proposed restructuring, amount to adverse actions taken against her which were not taken against younger, male individuals who were treated more favorably "when they had their job duties significantly altered." (Plaintiff's Response at 13).

Defendant asserts that plaintiff cannot establish a *prima facie* case of gender or age discrimination based on the elimination of what she terms "perquisites" of her job, because such changes do not amount to "adverse employment actions" as a matter of law, nor does plaintiff have any evidence to support her supposition that younger, male employees who were "demoted" retained their benefits.

Although the Tenth Circuit liberally defines an "adverse employment action," its existence is determined on a case by case basis and does not extend to a mere inconvenience or an alteration of job responsibilities.  *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir. 2000).  To be an adverse action, the employer's conduct must be "materially adverse" to the employee's job status, *Wells v. Colorado Dept. of Transportation,* 325 F.3d 1205, 1213 (10th Cir. 2003), or cause harm to future employment prospects, *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004). An adverse action must be a significant change in employment status, such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  *Aquilino v. Univ. of Kansas,* 268 F.3d 930, 934 (10th Cir. 2001).  In *Aquilino*, the court held that the removal of a university professor

from a dissertation committee did not constitute adverse action protected under Title VII, particularly since the removed professor had already been denied tenure. "Given Dr. Aquilino's tenure situation, her removal from the committee had, at best, a de minimis effect on her future employment opportunities." 268 F.3d at 934.

In the instant case, there is no dispute that plaintiff's removal from the Senior Management Team was her own idea, mutually agreeable to both the employer and herself. Although plaintiff thought her salary was going to be reduced based on information she claims to have received from a human resources representative, *see* Plaintiff's Response at 8, the undisputed evidence shows that no such pay cut was contemplated or implemented. *See* Ricketts Affidavit, Exhibit B to Defendant's Motion, at ¶ 12. Thus, what plaintiff describes as her "demotion" consists essentially of her relinquishing the title of Vice President, and her loss of use of the company credit card, cell phone and reserved parking space. This Court does not find that plaintiff has demonstrated an adverse employment action under Title VII or the ADEA arising from the job changes implemented in January 2004.

First, plaintiff makes no demonstration, or even an assertion, that the change of title was adverse to her job status, caused harm to her future employment prospects, or caused a significant change in benefits. Rather, like the plaintiff in *Aquilino*, the change appears to be more one of form than substance. Of course, plaintiff's duties might have changed when she stepped down from the Senior Management Team, but that change was at plaintiff's own request.

Similarly, the loss of use of the company cell phone and credit card are not changes in plaintiff's employment status that this Court can find to be significant. Indeed, plaintiff herself testified that she was not planning on using the credit card and her objection was more "a matter of principle."  Whitcomb Depo. at 286.

Plaintiff was clearly most upset about the loss of the use of the reserved parking space, although exactly what she "lost" is not clear from her testimony.  It appears that she was told that she would have to relinquish an inside parking place and instead park her car in an outside lot, apparently without a reserved space.  *Id.* at 285-86.  Whatever the situation, plaintiff herself admits with respect to all these asserted adverse actions, "[i]t's not so much that he [Alan Clark] asked me.  It's the way he demanded it and the–tone of his email to me and the way he–the way the whole thing played out."  *Id.* at 288.  Based on this evidence, the plaintiff has failed to demonstrate adverse employment conduct actionable under Title VII or the ADEA.

Moreover, even if these job changes were within the definition of adverse employment actions, plaintiff has not come forward with admissible evidence that the treatment she received was discriminatory based on gender or age.  The defendant asserts that according to company policy project managers, such as those in the position plaintiff was being transferred to, do not have reserved parking spaces, company cell phones or credit cards.  Ricketts Affidavit, ¶ 12.

Plaintiff asserts that defendant's employee, Steve McQueen, a non-Vice President had a reserved parking space and a credit card, and other unnamed Vice Presidents had cellular phones (Plaintiff's Response at 8).  However, she offers no

admissible evidence to support her assertion other than her own deposition testimony. *Id.* Yet, as defendant shows by admissible evidence, Mr. McQueen, although not titled as a Vice President, held the position of Controller of the defendant and was a member of the Senior Management Team, and therefore was provided with a reserved parking space and company credit card. Ricketts Affidavit, Exhibit A to Defendant's Reply, at ¶ 5. The affidavit further explains that while all Vice Presidents of defendant are members of the Senior Management Team, not every member of the team is a Vice President, as was the case with Mr. McQueen. *Id.* at ¶ 6.

Plaintiff also testified in her deposition that "probably" Steve Reding, a non-Vice President had access to a company credit card, and "Jim Rosen at some point in time" had a company cell phone (Whitcomb Depo., at 286-87). Thus plaintiff argues that male, or younger, non-Vice Presidents were allowed perquisites that plaintiff was denied. Yet such testimony hardly approaches the "the ocular proof" demanded by Othello (*see* W. Shakespeare, *Othello, the Moor of Venice*, (III, iii, 361)), but rather appears to be nothing more than plaintiff's speculation. Such conjecture, unrevealing of any first-hand knowledge by plaintiff that others were treated more favorably than her, does not suffice to defeat a motion for summary judgment. *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988) (mere conjecture that an employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment).

Because plaintiff has failed to establish a *prima facie* case of gender or age discrimination in connection with her alleged demotion, defendant's motion for summary judgment as to this claim is granted.

**C.     Whether plaintiff has established a *prima facie* case of gender or age discrimination in connection with her "termination" or constructive discharge.**

Plaintiff alleged in her complaint that she was terminated from her position on or about January 30, 2004 (Complaint, ¶ 15) under circumstances that demonstrate gender or age-based discrimination (Complaint, ¶¶ 20, 29).  However, in her deposition plaintiff testified, as set forth above, that on or about Monday, January 26, 2004, she telephoned Ms. Ricketts and advised her that she did not think she could continue working at FAND under the circumstances, and she was going to accept an offered severance package. Whitcomb Depo., at 296.  Thus, this Court finds that there is no evidence to show that plaintiff was terminated from her position with defendant, and at most she was constructively discharged, as she argues in her response to defendant's motion (Plaintiff's Response at 11).

Constructive discharge occurs when an employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.  *Garrett v. Hewlett-Packard*, 305 F.3d 1210, 1221 (10th Cir. 2002) (internal quotation marks and citation omitted).  The bar is quite high in such cases: a plaintiff must show he had no other choice but to quit.  *Id.*  In determining whether an employee's working conditions would cause such feelings in a reasonable person, the court must apply an objective test under which neither the

-16-

employee's subjective views of the situation, nor her employer's subjective intent with regard to discharging her, are relevant. *Tran v. Trustees of State Colleges in Colorado*, 355 F.3d 1263, 1270 (10th Cir. 2004). The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions. *Id.* Moreover, even if the conduct alleged by plaintiff met the definition of an "adverse employment action," that would not necessarily suffice to establish a constructive discharge because a constructive discharge requires a showing that the working conditions imposed by the employer are not only adverse, but intolerable. *Id.* at 1271.

Applying these standards to the facts of this case, viewing them in a light most favorable to the plaintiff, this Court cannot find that plaintiff was constructively discharged.  First, the changes to her employment status, namely the elimination of the Vice President title and the revocation of her reserved parking space, company cell phone and credit card usage, have already been found not to be adverse actions, much less a showing of working conditions that are intolerable. Second, as plaintiff herself testified, she made up her mind not to return to work only one or two business days after the implementation of the restructuring that she now claims constitutes intolerable working conditions.  Such a brief period of time is hardly sufficient to establish the intolerability of working conditions in less than clearly egregious circumstances, as is the case here. Finally, even if plaintiff did not like the "tone" of Mr. Clark's e-mail to her regarding the eliminated perquisites of the job, that does not arise to the level of an intolerable situation leaving no choice but to resign.  As the Court stated in *Baca v.*

*Sklar,* 398 F.3d 1210, 1218 (10th Cir. 2005), although plaintiff's "sour relationship" with his supervisor may have made quitting his best option, that does not present a genuine issue of material fact as to whether "he had no choice but to quit."

Accordingly, plaintiff's claims under Title VII and the ADEA for constructive discharge or wrongful termination must be dismissed.

### D.     Plaintiff's Claims of Promissory Estoppel and Breach of Contract.

Although plaintiff's complaint does not clearly set forth the representations allegedly made to her that give rise to her claims for promissory estoppel or breach of contract, her responsive brief clarifies the basis of her claims.  Acknowledging that she was an "at-will" employee whose employment may generally be terminated at any time, plaintiff argues nonetheless that policies or procedures published by an employer can alter the terms of an otherwise terminable at-will employment relationship (Plaintiff's Response at 14).  Thus, plaintiff argues that defendant's employee handbook contains a progressive disciplinary scheme applicable to her, and which defendant did not follow, thus giving rise to her claims for breach of contract and promissory estoppel (*id.* at 18-20).

Plaintiff is generally correct in her description of the applicable Colorado law. *Adams County School Dist. No. 50 v. Dickey*, 791 P.2d 688, 693 (Colo. 1990), recognizes that an employee is entitled to enforce termination procedures under a theory of promissory estoppel if she can demonstrate that the employer should reasonably have expected the employee to consider the employee manual as a commitment from the employer to follow the termination procedures, that the employee

reasonably relied on the termination procedures to her detriment, and that injustice can be avoided only by enforcement of the termination procedures. However, plaintiff's arguments here are lacking in at least two material respects.

First, the defendant's handbook on which plaintiff relies cannot be properly characterized as a mandatory "progressive discipline" policy that rises to the level of a contract, or provides the basis for a claim of promissory estoppel under Colorado law. Therefore it does not create a reasonable expectation that the employer will follow progressive termination procedures. For example, while the handbook refers to supervisors reviewing employee conduct in accordance with consistent established standards, it states in the same sentence that the employer "does not intend to relinquish our right to terminate an employee at will, and this does not replace or contradict the at-will status of all employees." (Excerpts from Defendant's Employee Handbook, Exhibit B to Plaintiff's Response, at 8). In a section headed "Employment Relationship," the handbook also states: "This at-will aspect of your employment, which includes our Company's right to demote or transfer, with or without cause or advance notice, may not be changed absent an individual written employment contract to the contrary . . . ." (*Id.* at 3-4). While the handbook states elsewhere, with respect to demotion, that movement of an employee to a lower level of responsibility may be reviewed on an individual basis, it also conspicuously states that such movement is "at our Company's discretion." (*Id.* at 8). The section on prohibited conduct states that employees "may" be subject to "immediate termination" for committing any of the listed offenses, but makes no reference to a progressive discipline system (*Id.* at 10). There

-19-

is no language in the handbook here that suggests that any mandatory progressive

termination procedures would apply.  *See Mariani v. Rocky Mountain Hosp. and Medical*

*Service*, 902 P.2d 429, 435 (Colo. App. 1994), *aff'd,* 916 P.2d 519 (1996) (if there is

evidence that the employer's supervisors treat the disciplinary procedures in an

employment manual as mandatory the contract issue should be submitted to the jury).

Moreover, as noted above, the language of the handbook contains explicit and

numerous disclaimers stating that it is not intended to form a mandatory or binding

policy on the employer, thus rendering any purported reliance unreasonable.  *Id.*

Second, even if the handbook were characterized as a progressive discipline

policy, there is no evidence here that plaintiff was terminated or disciplined.  As

discussed above, the undisputed facts here demonstrate that plaintiff voluntarily

resigned after the devil in the details of her reassignment proposal took center stage,

and she was neither terminated nor constructively discharged.  Hence, any progressive

discipline provisions in the handbook would have no application.

Finally, plaintiff contends that her promissory estoppel claim is supported by her

agreeing to change position in reliance on the agreement she thought she had made

with Ms. Ricketts that she would retain her title in her new position after the

reorganization, as well as her parking space, credit card and cell phone (Plaintiff's

Response at 21).  That argument, however, lacks merit.  In the first place, the Court

notes that even in plaintiff's description of the discussions she had with Ms. Ricketts that

led up to what plaintiff characterizes as an agreement, there is no mention of plaintiff

retaining her parking space, cell phone or company credit card.  Whitcomb Depo., at

254-67.   Moreover, plaintiff herself testified that the only act she took "in reliance" on her understanding of what Ms. Ricketts had "agreed" to, was to come to work the following Monday.   *Id.* at 304-05. This act does not provide the material detriment creating injustice necessary to supply the element of detrimental reliance required for such a claim under Colorado law.   *See Price v. Public Service Co. Of Colorado,* 1 F. Supp. 2d 1216, 1224 (D. Colo. 1998)*; Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708, 712 (Colo. 1987)

Accordingly, defendant is entitled to summary judgment on plaintiff's Third and Fourth Claims for Relief, as she has failed to demonstrate essential elements of her claims for promissory estoppel or breach of contract.

**CONCLUSION**

For the reasons set forth above, defendant's motion for summary judgment (Dkt. # 17) is GRANTED, in all respects.  Plaintiff's claims are dismissed with prejudice. The Clerk of the Court is directed to enter judgment for defendant in accordance with this Order.

DATED: January 27, 2006

BY THE COURT:

*s/ Phillip S. Figa*

_____
Phillip S. Figa
United States District Judge